All right, we'll call our final case of the morning. Michael Tseytin, and I'll find out if I'm pronouncing that correctly, versus Commissioner of Internal Revenue. And is it Mr. Senecandro? Yes, Your Honor, it is. Am I pronouncing that correctly? Yes, Judge, you are. Thank you. Good morning, Your Honors, and may it please the Court. My name is Lawrence Senecandro, and I represent Petitioners Michael Tseytin and Ella Tseytin. I'd like to reserve three minutes for rebuttal. Very well. There are three issues to be decided in this field, and I would like to address each in turn. The first issue relates to Mrs. Tseytin and whether she is responsible for any tax or penalty owed in connection with this case. Is there any dispute as to that? There's not, Your Honor. All right. The government concedes on brief. Right. We understand it has to be remanded for that purpose. Can you address, before we move on to the other issues, on that, initially you asked for reversal. There seems to be a claim that there was error here. In your reply, you agreed that remand was appropriate. Why, given that there was a stipulation that that was acknowledged by the tax court and, nonetheless, this error appears, why should we be remanding rather than simply reversing? You could certainly reverse, Your Honor, and we would not be opposed to that. Because it is a clerical error, we believe that the tax court would have the ability to enter an appropriate decision, and assuming that the case is remanded as to Mr. Tseytin, then the court would also have to make issues with respect to Mrs. Tseytin, in addition to finding her not liable for the deficiency or penalty. Specifically, if the case is remanded as to Mr. Tseytin, then ultimately the tax court would have to determine whether there is an overpayment of tax made, and Mrs. Tseytin would be equally entitled to a portion of that overpayment of tax. Yes, sir. Okay. So the second issue, Your Honor, is moving on, raises a question of statutory interpretation and the interplay specifically between Section 356A and 356C of the Internal Revenue Code. Now, the court's standard of review with respect to this issue is plenary, and I just want to provide some background with respect to the way that these provisions operate, because I think it's fundamental to understanding the Tseytin's argument. Section 354A of the Internal Revenue Code provides a general rule that gain or loss shall not be recognized if stock in a corporation is exchanged for stock in another corporation pursuant to a plan of reorganization. This is a general non-recognition rule recognizing the reorganization provisions of the Internal Revenue Code. Now, Section 356A sets forth an exception to that general rule, and it provides that if a taxpayer receives not only stock but also other money or property, which we refer to in tax parlance as boot, then that gain is recognized only to the extent of the money or the other property received. Now, Section 356C deals specifically with losses, providing that, quote, no loss from any exchange or distribution to which Section 354 would apply shall be recognized. And this is the point of contention between the government and the Tseytin's. Specifically, the issue for the court to decide is whether Section 356 requires a taxpayer to net any realized gains and losses to determine whether there is an overall gain or a loss in connection with the reorganization. Specifically, as applied to this case, if netting is required, then Mr. Tseytin has an overall gain in the transaction, and Section 356A applies. If netting is not allowed and the government is correct, then we apply a block-by-block approach with respect to the various stocks owned. You're assuming at this point ownership of the Archer shares. Are you going to address that to me? We will address that, Your Honor. And we do not believe that Mr. Tseytin at any point in time owned the Archer shares, and I'll get to that in due course. But in resolving the statutory of interpretation with respect to Section 356, the tax court failed to engage in any analysis of any kind whatsoever. If we're going to address the merits at this point on your netting theory, I'd just like to understand the math, because if we accept your theory that there is or can be internal netting of realized gains and losses, why doesn't it work out, as the IRS pointed out and as the tax court did in its calculations, under that theory your claim actually has more tax liability, not less. We would disagree, Your Honor, and we would note that the Commissioner below specifically agreed with our calculation of the way that the gains and losses are calculated, but for the netting issue. Help me understand your argument, because you point us back to your briefing the tax court. So, at Appendix 482 and 483, you identify the realized gain for non-Archer shares as the 40 million figure. I don't believe that that was us, Judge. The tax court, we believe, has it wrong, and I can explain why. Section 354 is going to provide that general non-recognition. How would you do the math for us now? What's the correct way to do the math? There would be an allocation under Section 356-1D, Example 3 of the regulations, and we would allocate a portion of the basis to the Archer shares and to the non-Archer shares. By allocating that basis, we would have essentially all of the consideration received, the $31 million or so in consideration received with respect to the non-Archer shares, would be non-taxable. The $23 million or so that was received with respect to the cash that was actually received would be partially taxable and partially non-taxable. In other words, we would allocate to the Archer shares and to the non-Archer shares, and we would recognize the 40 million. Let me step back, because this is the same analysis, and A483 actually reflects your opening brief in the tax court. When we take the cash value and the value of the stock together, we're at the 53 million. When we're looking at the non-Archer share gain realized, we take 75% of that. That takes us to the 40 million figure. And that's why in your brief at 483, you advised the tax court the realized gain on the non-Archer shares was the 40 million figure. The problem seems to be that on the very next page, when you move into your netting theory, you switch that number with the recognized gain of the overall transaction, the 17 million, instead of the 40 million that you yourself acknowledged on the prior page was the realized gain figure. Right, Your Honor. But just because we have a realized gain doesn't mean that we recognize all of that gain, because under Section 354, the general rule is that we defer recognition until there is an actual exchange, except with respect to cash or other property, right? And that's what we're doing. We're recognizing the gain with respect to the cash or other property, because Section 356 requires that we do so. Is your theory then not that we are looking at the netting of realized gains and losses, that we are to be looking at the netting of recognized gain, and then losses netted to that? No, Your Honor, because in order to get the overall amount of gain that has to be recognized in the transaction, the singular transaction, you compute the various gains or losses realized with respect to each stock. You then net those gains or losses to determine the overall gain to be recognized. So can we agree on what the figures are that we should be looking at as we're reviewing the decision here? Is for the non-Archer shares, is the gain realized, the 40 million figure? No, Your Honor, it's not, because the gain would only be recognized to the extent of the cash, which was limited to 20 percent. The gain realized for the non-Archer shares is the 40 million figure. Yes, and there would be no triggering of the tax on that 40 million. And the loss realized on the Archer shares is the 500,000 figure. Exactly right, Your Honor. So if we accept that there is then the internal netting theory, what we're looking at is the 40 million minus the 500,000, which takes us to approximately 39 million. Right, and that would be a realized gain, Your Honor. So a portion of that realized gain would be embedded in the Archer shares, and a portion of that realized gain would be embedded in the cash, and we would be forced to recognize that under Section 356. Isn't the next step, after we do the netting of the realized gains and losses, where we are instructed to cap that liability then at the boot, the 23 million? Exactly right, Your Honor. So the 23 million then would be reduced by the amount of – 23 million would be reduced by the basis attributable to that portion of the shares, so the 75 percent, 25 percent allocation. Wasn't that calculation, the 75-25, was already handled when we went – when we were doing the calculation as to realized losses? Where is this additional step coming in as part of any kind of internal netting theory that has any basis in, you know, any preamble or IRS regulation? They're separate issues, Your Honor. We're computing the realized gain or loss, but we're not necessarily realized – the amount realized under Section 1001 of the Internal Revenue Code is simply the amount of money or the fair market value of the property received in connection with the exchange. We then reduce the amount realized by our basis in those securities, in that stock, in the cash, in order to compute the overall amount recognized. So we allow the netting of gains and losses in connection with that realization and the recognition of that. Do you want to address the Danielson rule in agency arguments? Gladly, Your Honor. The most important point to note regarding Danielson and the related issues is that Mr. Satan should not be held taxable on the $14 million that was ultimately transferred to Archer. This issue presents a question of mixed fact in law, but because the tax court erred in failing to consider New York law in its conclusion that Mr. Satan was the de facto owner of the Archer shares, clear error was made. Excuse me, I'm sorry. The NOVA review applies. Specifically, in Aquilino v. United States, the Supreme Court made very clear that federal tax is determined by reference to a taxpayer's state-created rights and interests in property. So to really understand whether Mr. Satan owned the Archer shares, as the tax court concluded, we really need to look at the Archer agreement to understand what specific rights and obligations were created under state law. This is specifically what Mr. Satan argued to the tax court below and what the tax court declined to consider. Specifically, the Archer agreement contained a choice of law provision specifying that New York law governed the contract, and under New York law, a person who has induced a buyer to sell stock in a corporation by a false representation, such as the failure of consideration, for example, may be interested in that stock purchase agreement. It was not certain until Mr. Satan made the $14 million payment to Archer on July 5th, after the closing actually occurred, whether he would ever acquire legal title to the shares in order to transfer the property. For that reason, Mr. Satan held bare legal title to the shares, and at all relevant times, Archer had a unilateral right of rescission under the Archer agreement. Was there really any doubt that he would get the shares? Was there any doubt that Mr. Satan would get the shares? No, Your Honor, but it's certainly possible, and to the extent that it was, you can bet that Amherst would have sued either him or Archer for specific performance of the shares. Now, when you think about this transaction in respect of everyday commercial transactions, the tax court's opinion is really shocking. If the reasoning was applied to everyday stock transactions involving public companies, like Amherst, we could potentially have a situation. I see that I'm out of time, Your Honor, so I'll finish your answer. Go ahead. Thank you. We could potentially have a situation that any time we're dealing with a major broker-dealer, like a Goldman Sachs or Merrill Lynch, who sells stock on behalf of a customer, that broker-dealer would actually be required to report incomes on the proceeds that they transitorily held, and that would apply regardless of whether the broker-dealer is holding the stock in street name or under the name of the individual depositor. We don't have this absurd result outside of this case. Why? Because federal tax law cedes to state law, and that's the exact same result that the tax court should have reached here. Thank you. Thank you. Ms. Moriarty? May it please the Court, I'm Regina Moriarty, representing the Commissioner of Internal Revenue. I'm going to address the agency issue first. The tax court correctly held here that there was absolutely no evidence that the taxpayer acted as an agent or nominee of merger with respect to the transaction. You have the two agreements, the purchase and sale agreement, the merger agreement. They're all consistent that the taxpayer here was going to buy this stock for his own benefit. He was going to own it free and clear. He was going to get beneficial title, all of that. Those two documents, there are other documents in the record as well, up to documents signed two years after the fact, where the taxpayer is still asserting, I'm the sole shareholder of USSI. The corporation is wholly owned by him. The Danielson rule – Before we leave agency, you seem to address the Bollinger factors as mandatory as opposed to permissive in the criteria by which to evaluate agency. What's the authority for that? Why shouldn't we be considering more broadly just the national carbide factors in addressing the question of agency? I believe Supreme Court in Bollinger went back and looked and said those six aren't always going to determine the case, but fundamentally here's what we want to look for. We want to make sure that there's a written agreement, which we don't have here. We want to make sure that the party functions as an agent and not as principal. Here you can't really tell what's going on. He's saying he's acting on his own behalf. He's never once represented in any of the documents that he's working as an agent. It seemed that he didn't hold himself out as such, and so the Bollinger case is sort of setting this parameter around the carbide, the six issues there is how I viewed it. In Danielson, well, the tax court here correctly rejected the assertion that the taxpayer, excuse me, rejected taxpayer's assertion that he should not be bound by the agreements that he entered into. It may well be that this deal could have been structured differently. Maybe there were non-tax business reasons why this deal was structured the way it is, but once all those documents were signed, Danielson stands for the proposition that the IRS should be entitled to look at those unambiguous contracts and deal with them as such and shouldn't be forced to litigate between various parties as to what the terms of the agreements were. By now asserting that he was acting as an agent, the taxpayer is attempting to change the terms of the agreements that he entered into. My opposing counsel raised the state law issue here, but the IRS should not be forced to engage in that type of complexity and looking into a contract where it's clear on its face what was going on. And so here, taxpayer's own merger agreement and purchase agreement led the IRS to its factual findings that the taxpayer bought the shares for his own benefit, became the sole shareholder of such, and completed the merger on that basis. So he's simply just trying to get out of the deal that he entered into. In the brief, they discuss that this isn't a whipsaw issue for the IRS. The record in this case is simply not sufficient to make those kinds of statements. The archers return if one was filed at all is not in the record. We don't know if they were required to file a return. If they did file one, if they reported it, the basis for Danielson is that the IRS simply shouldn't be required to litigate all the underlying facts in those contracts between different parties. Moving on to the 356 loss issue. You would, Judge Krauss, would write to the issue of the numbers in this case if internal netting were allowed. But it's the position of the commissioner that Section 356C prohibits any type of loss. Let's come back to that. But in terms of the math here, is there an additional step? Do we end up, as you assert in your brief and as the tax court seemed to, capping liability at the boot because we've already done the breakdown of the 7525? With an internal netting theory, is there some other step after we get to the tax liability of the $23 million? No, there is no additional step because you would have already netted the realized against the realized. And it seems to me they're trying to net a realized against a recognized. Once you reduce the $23 million by the 75% under 356, that becomes the recognized gain. And you would then, there is no, can be no recognized loss under the clear terms of 356C. So you can't net those two yet again. If you were going to allow netting at all, which we don't agree that there should be, then it would only be done at the first step. And that's what's pointed out, I think, on pages 51 and 52 or something like that of the commissioner's brief at the end. We did not agree with their position. And I think when I went back and looked at the tax court briefs and the pages they cited, the first set of computations on the commissioner's brief on the 8387 deals with separating them out. Here's the 75%, here's the 25%, capping the $23 million at the 75%, so you get down to about $17 million. And then not allowing any loss against that. As you pointed out on page 482 of their brief, they realized the figures that you gave, the $40 million minus the $500,000, that those are the realized figures. And then in the government's responding reply brief in the tax court, we made the same argument that I made in pages 51 and 52 of our answering brief in this court. Which was adopted by the tax court, these calculations. Yes. Well, not really adopted in terms of their calculations, but just noting that if you took their netting argument and applied it properly, then they would end up paying more. There would be more gain for them to pay tax on. So is internal netting theory really expressly precluded by 356C? The language of the statute talks about no loss from the exchange or distribution shall be recognized. Doesn't that permit a netting of realized? If you net a realized loss against a realized gain, you are, in effect, recognizing that loss. And so that's why the case law, starting with Lakeside and Curtis, and specifically the revenue ruling that's mentioned in this case, 6823, holds that each item of property transferred in a merger should be considered separately. Because the logic of the revenue ruling is that any treatment of such netting that would have the effect of allowing a loss is prohibited. But that revenue ruling dealt with a net loss, which clearly would be prohibited as a recognized loss. But that doesn't really speak to netting of realized loss against a realized gain. That was the case in that case, but allowing netting of gains and losses in any circumstances is going to effectively mean that a loss was recognized. Contrary to the plain language of the statute and the regulations, when Congress wants to write a statute that allows for net gains or net losses, it knows how to do that. Some of the examples of those would be 26 U.S.C. 1201, 1212, 1222, 1231, 1375. Those statutes all specifically, in language, talk about net gains, net losses, and how you compute those. This statute is very different. I think if you go back to where this sort of starts at 354, where the statute provides, we're not going to recognize gains or losses here if you're exchanging stock for stock. What you're going to do is just kind of carry your basis over. But then 356 comes in and says, but if you receive cash or property with the fair market value of that, you're going to recognize gain with that. And so what it seems to me the statute is doing is it's saying, in effect, you're cashing out something here when you're not just changing stock for stock and continuing on. You are getting cash back, and we're going to tax that. But that boot roll doesn't mean that it's an occasion to claim a loss that you haven't really seen yet. And so that's why, in this case, the value of the 25% of the share, the Archer shares that are turned in for the AMS, they will continue to have that $14 million basis because that loss wasn't recognized. And that paper loss, whatever you want to call it, will be taken into account when the AMRES shares are then disposed of. It appears that this kind of realized netting theory is one that at least the IRS has entertained in its preamble, in 2006 and 2009 notice, as your adversary points out. But I take your position to be even if there's ambiguity in the statute that would permit that, if the IRS opted to take that position or if it had been interpreted that way by the tax court, neither the agency nor case law at this point supports that theory. That's correct. And simply asking, as the IRS did, simply asking for comments and interpretation or advice, whatever you want to say, doesn't mean that the tax court could take those statements in the preamble and treat it as law and then rule on that basis as they suggest in their briefs. The IRS does this all the time. They will seek advice and comments. It helps them do a better job in their rulemaking. To date, absolutely nothing has been done on this, and I check there is no ongoing project with regard to this issue. So the statute is still no losses recognized. If the court has no further questions. No, thank you very much. Affirmed as to Mr. and remanded for Mrs. just to have the clerical decision clerically corrected as to her. And so why should it be remanded rather than reversed? Because the tax court recognized in its opinion that the IRS granted innocent spouse relief to the wife, and it simply made a clerical error, and I think the rules are that the tax court can, that you remand it just for them to correct that minor clerical error. It doesn't really need to be reversed. I don't know if it's a nicety or what it's called, but. Is there a requirement that it be remanded rather than reversed? Why should we take that additional step, an additional burden on the tax court, if it's clear that there was an error, both parties have agreed to that on appeal, and the stipulation was in the record below and acknowledged by the tax court? I don't know that there is. It just seems to me that it probably should have been taken care of in the tax court when the decision first came out. One of the parties should have realized that that mistake was there and had corrected at that time. Thank you. Just a few questions, Your Honor. The tax court and the government placed undue emphasis on the merger agreement, and that's why Danielson is being even raised in this case. The short answer is that the Archer agreement is the agreement that the tax court should have considered, and specifically what Mr. Satan's rights were under the Archer agreement. If we are correct, the New York law would regard the transaction as incomplete until July 5, 2007 when the closing occurred. Mr. Satan never had legal title to the shares, the Archer shares, and the income is properly attributable to Archer. So the short answer is that Danielson doesn't apply because we are not disavowing the form of our transaction. We are scrutinizing the form of our transaction under state law. But more importantly, Danielson exists to make sure that parties on opposite sides of the transaction are treating the same transaction similarly. In this case, Archer and Satan were on the exact same side of the transaction. Amherst was on the other side of the transaction. Why was it structured this way? I'm trying to figure out why have Archer and Satan enter into this agreement and then provide for it. I can understand why you don't have the money. You can't pay it until after the merger goes through. You don't get the cash, but it just struck me as why wasn't Archer a party to the merger? Sure. Ideally, Your Honor, it would have been great to see a separate agency agreement set up between Archer and Satan. But I think that that agency agreement is implicit throughout the entire Amherst agreement because in the Amherst agreement, the parties specifically know the distinguishment between the Archer shares and the non-Archer shares. But for the agency relationship, there's no reason to draw that distinction whatsoever. Moving on to the netting argument, I just want to address a couple of comments that Ms. Moyer already made. Regarding the applicability of Lakeside and Revenue Rule 68-23, Lakeside deals with an entirely different provision of the Internal Revenue Code. It deals with Section 24B of the 1939 Internal Revenue Code, which dealt with related parties, which has absolutely nothing to do with Section 356A or C. In addition, Ms. Moyer already said that netting was improper because Mr. Satan should not be allowed to draw out cash. Fundamentally, the reason that that position is wrong is because it's inconsistent with the overall economics of the transaction. If Mr. Satan economically realized that loss of $500,000, then he should be able to offset any realized gain by that amount. Finally, I just want to note, Ms. Moyer already said that Mr. Satan isn't harmed in this case because the loss is ultimately transferred to the basis and the shares. That's not accurate because conceivably you could have a situation where the share price drops so low that the basis and the shares could result in a never-ending capital loss. That's very similar to what happened here. The share price dropped post-2007 and the basis is essentially eliminated and not able to be used. Can you address briefly the penalty? Isn't that an issue that is waived, at least to the extent you're raising any challenge to the penalty beyond its relation to the alleged deficiency and the merits of those arguments? Yes, Your Honor. If we don't prevail on either the income issue or the netting issue and the penalty issue, the tax court should be sustained on that point, yes. Even if you do prevail on one of the other issues, doesn't the penalty relate to the original 2007 tax rate? How would that be addressed by any ruling we might make as to the amended returns? That's a fair question, Your Honor. Under Section 66-2A of the Internal Revenue Code, we would look to determine whether there is an overall underpayment of tax. When we perform the calculations, there would not be an underpayment of tax. There would be an overpayment of tax, which is why we believe that the case needs to be remanded to the tax court in any event, because the tax court performed no factual finding as to the amount of the credit and the amount of tax that Mr. Satan actually paid and for which he is entitled to a refund. Thank you, Your Honors. Thank you very much. The case was well presented. We'll take it under advisement. I'm going to ask counsel in this case if they will get together with their court crier and make arrangements to have a transcript of the argument prepared so we can have the transcript as well. And I split the costs. Thank you very much. Court is now adjourned.